UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RODNEY EARL BROWN,

     Petitioner,

v.

WARREN A WILSON,

     Respondent.

Case No. 21-10547
Honorable Laurie J. Michelson

---

## OPINION AND ORDER DENYING PETITION FOR HABEAS CORPUS

As Larnel Brown exited a bar on a summer's night, he happened to see Terrell Jenkins. The two had fought the week before and began fighting again. While Larnel was fighting Jenkins, Larnel was shot in the leg. And George Parks, who was near the fight, was also shot in the leg.

Authorities ultimately charged Rodney Brown, who accompanied Jenkins to the bar, with shooting Larnel and Parks. At trial, Brown described a rather chaotic scene outside the bar, and he said that someone had attacked him and had placed him in a chokehold. Unable to breathe, Brown said he drew his gun in self-defense. And, says Brown, a struggle ensued, and the gun fired. But the prosecution presented two eyewitnesses who testified that Brown had aimed his gun at Larnel specifically or the fight in general and fired a shot.

A Michigan jury convicted Brown of assault with intent to do great bodily harm (among other crimes). Brown's conviction was affirmed on direct appeal.

Brown now turns to federal court, seeking a writ of habeas corpus. For the reasons set out below, the Court finds that Brown is not entitled to the writ.

## I.

### A.

On July 29, 2017, Brown agreed to meet his friend, Terrell Jenkins, at the Woodward Bar & Grill in Detroit. (PageID.1308, 1339, 1341.)[1] Brown and Jenkins arrived in the vicinity of the bar around closing time. (PageID.1341.) When the Woodward Bar closes, people often hang around outside the club. (PageID.686, 863, 893, 1305.) That night, there were anywhere from 50 to hundreds of people outside the club around closing time. (PageID.894, 1001, 1307, 1342.)

Among the crowd were three friends, Larnel Brown, Brandon White, and Richard Allen. (PageID.685–686, 885, 889, 998–999.) After exiting the Woodward Bar, Larnel spotted Jenkins (Brown's friend). The week prior, Jenkins had punched Larnel during a fight. (PageID.1306.) So when Larnel saw Jenkins outside the club, he punched Jenkins in the face. (*See* PageID.698, 901, 1005.) The two began fighting. (PageID.700, 901.) The fight ended up in an alley near the club, where 15 or so others were congregating. (PageID.1010.)

The fighting stopped when Larnel was shot in the leg. (PageID.1013.) George Parks was near the fight and was also struck by a bullet. (PageID.849, 853.)

---

[1] Unless indicated otherwise, all record citations are to the Rule 5 materials, ECF No. 6.

At his trial, Brown testified that after he met Jenkins near the club, he and Jenkins were walking in the alley and saw a fight. Brown recalled that he and Jenkins started to turn back the other way. (PageID.1345.) Brown said that as he was headed back through the alley, he saw "a crowd of people rushing toward him" and that he was "punched in the back [his] head." (PageID.1345.) Brown told the jury that he began defending himself against this attacker, who was "six feet plus" and "for sure over 200 pounds." (PageID.1346.) Brown explained to the jury that at some point during their fight, the attacker was able to grab Brown around his neck with his forearm in a chokehold. (PageID.1347.) Brown recalled, "[a]fter that I realized when I couldn't breathe, I reached for my handgun." (*Id.*) According to Brown, the two struggled over the gun and it fired four times. (PageID.1348.) Brown testified that the last shot struck him in the hand. (PageID.1349.)

Larnel, Allen, and White (the three friends) each gave testimony contrary to Brown's account. Larnel told the jury that when he looked up after being shot, he saw Brown with a gun in his hand. (PageID.1016.) Larnel did not see anyone attacking Brown. (PageID.1017.) White likewise told the jury that he saw Brown pull out a gun and fire a shot toward Larnel. (PageID.907, 910–911.) White also did not see anyone attacking Brown. (PageID.917.) Allen testified that he heard one shot and that when he looked, he saw Brown with a gun. (PageID.707–708.) Allen said that he then saw Brown fire a shot up into the air. (PageID.710.) Then, according to Allen, Brown aimed "directly between" Larnel and Jenkins (who were still fighting) and fired two

shots. (PageID.710–711.) Allen further testified that after the last shot, he saw someone around "six-two" try to take Brown's gun away. (PageID.711, 716.)

Having heard this and other evidence (including forensic evidence that casings recovered from the scene were fired from a gun Brown owned), a jury convicted Brown of two accounts of assault with intent to do great bodily harm less than murder and two counts of carrying a firearm during the commission of a felony. *People v. Brown*, No. 346401, 2019 WL 7206131, at \*1 (Mich. Ct. App. Dec. 26, 2019). The jury acquitted Brown of a host of other charges, including assault with intent to murder. *Id.* at \*1 n.1. For the assault convictions, Brown received concurrent sentences of one to ten years in prison. *Id.* at \*1. For the firearm convictions, Brown received concurrent sentences of two years, but those were consecutive to the assault sentences. *Id.*

## B.

Brown appealed his conviction. The Michigan Court of Appeals denied relief. *See generally People v. Brown*, No. 346401, 2019 WL 7206131 (Mich. Ct. App. Dec. 26, 2019). And the Michigan Supreme Court did not grant leave for further appeal. *People v. Brown*, 944 N.W.2d 702 (Mich. 2020).

Brown then filed this petition for a writ of habeas corpus.

## II.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") (and 28 U.S.C. § 2254 in particular) "confirm[s] that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington v. Richter*, 562 U.S. 86,

4

103 (2011); *see also Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). To be more specific, if the state courts adjudicated the claim "on the merits," then, under § 2254(d), a petitioner must show that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d). But if the state courts did not adjudicate a claim "on the merits," § 2254(d) "does not apply." *Bies v. Sheldon*, 775 F.3d 386, 395 (6th Cir. 2014).

## III.

### A.

Brown's petition raises a host of prosecutorial-misconduct claims.

### 1.

Brown claims that the prosecutor unfairly baited him to testify in a way that undermined his defense. (*See* ECF No. 1-1, PageID.26.) To appreciate this claim for the writ, some backstory is necessary.

When Brown was in jail awaiting trial, he called a friend. During the call, Brown told his friend, "They jumped on Terrell [Jenkins] the week before and then I . . . just happen to get caught in the *crossfire* Wednesday. . . . I just so happened to get caught in the *crossfire and it's like a hundred fights*." (PageID.2091 (emphases added).)

At trial, the prosecutor used a recording of the call to impeach Brown. She first got Brown to admit that "crossfire" meant people shooting at each other: "You indicated to us that your understanding of crossfire means two or more guns

shooting? Yes. At each other? Yes." (PageID.1409.) Then, later during her cross examination of Brown, the prosecutor played selected portions of the jailhouse call—apparently the portions where Brown told his friend that he had been "caught in the crossfire." (PageID.1414.) (The portions of the recording played to the jury were not transcribed.) The prosecutor asked, "[a]nd you're telling [your friend] you got caught in a crossfire?" (PageID.1414.) Brown attempted to clarify, "Of their fight. You didn't play the rest of it." (PageID.1414.)

During her closing argument, the prosecutor referred to the jailhouse call. "[Brown testified] that gun went off as he was struggling over it. I asked him sir, what's a crossfire and he indicates when two guns are shooting. . . . His conversation with his very good friend talked about . . . what is a crossfire. That's not what he told you here by his own definition." (PageID.1658.) The prosecutor also argued during closing, "He's talking to a very good friend on the phone from jail . . . . Don't you think at that point he would say, oh, my God, you would not believe what happened to me, this guy tried to choke me to death[?]" (PageID.1655.) In other words, the prosecutor argued to the jury that Brown's claim that he was being choked and thus took out his gun in self-defense was not believable because (1) Brown had told his friend that there was "crossfire" and (2) he had defined "crossfire" as involving people shooting at each other.

Brown believes the prosecutor's setup—first asking for an abstract definition of "crossfire" and then playing the recorded jail call where he used that term in a different way—was misconduct. Brown argues that when he was speaking with his

6

friend from jail, he used the term "crossfire" as a figure-of-speech, i.e., that he was caught up in a fight or a series of ongoing fights between Larnel and Jenkins—their "crossfire." (ECF No. 1-1, PageID.34; ECF No. 7, PageID.2690.) So by first asking him to define the term "crossfire" in the abstract, Brown says that the prosecutor cast his jailhouse statements in a false light and misled the jury. (*See* ECF No. 1-1, PageID.33; ECF No. 7, PageID.2690.) And, says Brown, this misleading evidence directly undermined his defense: in response to an attacker choking him breathless, he pulled out his gun in self-defense, and the gun went off as he and the attacker struggled over it.

The Michigan Court of Appeals rejected this claim. The state appellate court explained, "[Brown's] insistence that he used 'crossfire' metaphorically to indicate that he was caught in the middle of Larnel's fight with [Jenkins] misses the point of the prosecutor's line of questioning, which was less about 'crossfire' than about the differences in [Brown's] accounts of the shooting incident." *People v. Brown*, No. 346401, 2019 WL 7206131, at *3 (Mich. Ct. App. Dec. 26, 2019). "The prosecutor set the snippet of recorded conversation in the context of questions aimed at showing that defendant's initial account of his injury did not entail self-defense against a larger man who was strangling him." *Id.* The state appellate court continued, "Regardless of the meaning defendant gave [for] 'crossfire,' these [initial] explanations differ from what he told the jury, i.e., that he pulled his gun because a taller, heavier man was choking him and he thought he was going to die." *Id.* The

Michigan Court of Appeals thus concluded that Brown had not shown plain error affecting his substantial rights. *See id.* at *2–3.

Although the Michigan Court of Appeals engaged in plain-error review, that is still an "on the merits" determination for purposes of § 2254(d). *See Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017); *Edwards v. Burt*, 823 F. App'x 326, 333 (6th Cir. 2020). And that means this Court's task is very limited: the job is merely to decide whether the Michigan Court of Appeals' adjudication of this claim was contrary to, or unreasonably applied, a holding of the U.S. Supreme Court or was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

Although Brown cites a number of Supreme Court decisions, he has not cleared § 2254(d)'s bar to relief. *See Trimble v. Bobby*, 804 F.3d 767, 783 (6th Cir. 2015) (explaining that because the prosecutorial-misconduct standard from *Darden v. Wainwright* is "very general," overcoming § 2254(d) requires a habeas corpus petitioner to cite "other Supreme Court precedent that shows the state court's determination in a particular factual context was unreasonable").

Brown points to *Miller v. Pate*, which states that "the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence." 386 U.S. 1, 7 (1967). There is nothing false about Brown's testimony or the recording of his call. And Brown presents no evidence that the prosecutor in fact knew that Brown had used the term "crossfire" metaphorically during the jailhouse call and, despite that knowledge, elicited the literal definition from Brown at trial. And even assuming that is what happened, it is at least arguable that the prosecutor's

8

more general point—that Brown's account on the call did not match his account at trial—was true. And if that point is arguable, it cannot have been unreasonable for the Michigan Court of Appeals to find that "[Brown's] insistence that he used 'crossfire' metaphorically to indicate that he was caught in the middle of Larnel's fight with [Jenkins] misses the point of the prosecutor's line of questioning, which was less about 'crossfire' than about the differences in [Brown's] accounts of the shooting incident." *Brown*, 2019 WL 7206131, at *3.

Brown also says that his situation was "eerily similar" to the Supreme Court's decision in *Berger v. United States*, 295 U.S. 78 (1935). But that case is not like this one. *See id.* at 84–87 (finding misconduct where prosecutor insinuated that defendant had threatened him outside of court, implied that the law would not permit an in-court identification when, in fact, the witness had trouble identifying the defendant, and conducted himself in a "thoroughly indecorous and improper manner").

Brown also relies on *Alcorta v. State of Tex.*, 355 U.S. 28 (1957). There, the defendant was charged with killing his wife, and his defense was that he acted in a fit of rage when he saw another man kissing his wife. *Id.* at 29. Before trial, the other man had confessed to the prosecutor that he had "sexual intercourse with [the defendant's] wife on five or six occasions within a relatively brief period before her death." *Id.* at 30–31. The prosecutor told the man that he should "not volunteer" that information but to answer truthfully if specifically asked about sexual intercourse. *Id.* at 31. At trial, the other man essentially testified falsely that he was merely friends with the defendant's wife. *Id.* at 29. *Alcorta* is not like this case at least

9

because, as stated, Brown cites to no evidence that the prosecutor knew that he was using "crossfire" metaphorically during the jailhouse call. Moreover, even if the prosecutor consciously tried to mislead the jury, the prejudicial effect of the prosecutor's conduct in this case is simply not comparable to the prejudicial effect of the prosecutor's conduct in *Alcorta*.

In short, § 2254(d) prevents the Court from granting Brown habeas relief on his claim that the prosecutor engaged in misconduct by suggesting to the jury that Brown had admitted that there were multiple people shooting at each other on the jailhouse call. (ECF No. 1-1, PageID.26.)

### 2.

In a closely related argument, Brown says that by using snippets of the "crossfire" phone call, the prosecutor impermissibly shifted the burden of proof to the defense. (ECF No. 1-1, PageID.35.)

The Michigan Court of Appeals addressed this claim. It stated, "There is likewise no indication that the prosecutor shifted the burden of proof regarding self-defense to defendant or commented on his failure to present evidence." *Brown*, 2019 WL 7206131, at *8. "To the contrary," said the Michigan Court of Appeals, "the prosecutor explicitly stated that she bore the burden of establishing that defendant did not act in self-defense. She then urged the jury to find that she had met that burden because none of the evidence was consistent with defendant's testimony." *Id.* "It would be unreasonable to believe that a stranger attacked defendant without provocation; a more reasonable view of the evidence suggested that defendant only

struggled with the unknown person after the shooting, when that person attempted to disarm him." *Id.* "In other words," the state court continued, "the prosecutor did not remark on defendant's failure to present evidence—she argued that the evidence presented did not support a finding of self-defense. The prosecutor did not err in this regard." *Id.*

That was an "on the merits" adjudication, and the Court does not believe that the Michigan Court of Appeals unreasonably applied U.S. Supreme Court precedent or made an unreasonable factual determination. *See* 28 U.S.C. § 2254(d). True, the prosecutor did attack Brown's claim of self-defense: "There is nothing, ladies and gentlemen, to support a self-defense claim by the defendant, not one single witness, the medical records, his own word doesn't support it. This is a yarn that was spun[.]" (PageID.1717–1718.) And true, the prosecutor did attempt to show that Brown's account changed over time by using the "crossfire" phone call. (PageID.1716.) But merely showing that a defendant has offered inconsistent accounts does not shift the burden of proof. And, as the Michigan Court of Appeals stated, the prosecution told the jury that it had the burden: "It is the People's burden to show that the defendant did not act in self-defense." (PageID.1717.) In all, the Michigan Court of Appeals reasonably found that the prosecution did not shift the burden of proving self-defense to Brown.

**3.**

Brown also argues that the prosecutor engaged in misconduct by repeatedly inviting the jurors to consider impeachment material as substantive evidence of his guilt.

Primarily, this argument centers on the prosecutor's use of Allen's statement to a police officer, Lynn Woods. (*See* ECF No. 1-1, PageID.40–43, 50–52.) Allen testified early in the trial. He told the jury that he saw someone try to take Brown's gun. (PageID.716.) When the prosecutor asked if any shots were fired during that struggle, Allen testified, "*I [didn't] see or hear any*. I don't recall that." (PageID.718 (emphasis added).) But later in the trial, Woods testified that Allen had told him that an "unknown person tried to wrestle a gun away from [Brown,] and *[the gun went off] and struck [Brown's] hand*." (PageID.1103 (emphasis added).) The prosecutor indicated that she was offering Allen's statement to Woods "for impeachment." (PageID.1102.)

Still later in the trial, the prosecutor again referenced Allen's statement to Woods. The prosecutor attempted to admit Brown's medical records and argued that they were relevant because "[they] [went] along with a statement made by Richard Allen as it relates to how [Brown] injured himself." (PageID.1283.) At that point, Brown's counsel sought a mistrial because the prosecutor had suggested to the jury that Allen's statement to Woods was substantive evidence, i.e., the truth. (*See* PageID.1283–1288.) The court denied the motion. (PageID.1286.)

During her closing argument, the prosecutor again referenced Allen's statement to Woods. She argued, "Allen [testified that he] couldn't remember whether an additional shot was fired when the gun was being—tried to be taken away from [Brown]. But if you recall, Officer Woods who spoke to Mr. Allen that night indicated that Mr. Allen told him that Rodney Brown was struck in the left hand by the gun when an unknown person tried to take the gun away from him." (PageID.1651–1652.)

Apart from Allen's statement to Woods, Brown also argues that the prosecutor used material to impeach Larnel as substantive evidence. (ECF No. 1-1, PageID.40, 50.) The portion of the transcript that Brown relies upon does not reflect all that transpired (sidebars and playbacks of recordings were not transcribed). (*See* PageID.1044–1048.) Even so, Brown says that after Larnel testified that he did not see who had shot him, the prosecution played a recording of Larnel's prior statement indicating that he had seen the shooter. (ECF No. 1-1, PageID.50; *see also* PageID.1044–1048.)

Taking this all together, Brown argues that the prosecution "built its case to disprove self-defense by stacking impeachment evidence on top of impeachment evidence and telling the jury it was substantive [evidence] they could use to find [him] guilty." (ECF No. 1-1, PageID.53.) Although the trial court gave a limiting instruction at the end of trial about inconsistent statements, Brown believes that was not sufficient; in his view, the trial court should have given a specific instruction about not considering impeachment material as substantive evidence when the prosecution

13

used Allen's statement to Woods and Larnel's prior statement. (*See* ECF No. 1-1, PageID.50; ECF No. 7, PageID.2691–2692.)

Although Brown packaged his impeachment-material-as-substantive-evidence argument in a different form on direct appeal, the Michigan Court of Appeals addressed the prosecution's use of Allen's statement to Woods. The state appellate court found that the prosecutor appropriately elicited Allen's statement to Woods because Allen's "credibility was relevant to matters beyond the veracity of his inconsistent statement." *Brown*, 2019 WL 7206131, at *5. As for the prosecutor's remark that Brown's medical records "[went] along with" Allen's statement to Woods, the Michigan Court of Appeals reasoned, "At the time of the prosecutor's comment, the jury had already heard from Officer Woods that Richard [Allen] reported [Brown's] hand being injured during the postshooting struggle for the gun. The jury also knew that Richard . . . [had] testified that he did not see what happened to [Brown] after the struggle began." *Id.* at *9. Thus, the Michigan Court of Appeals found that the prosecutor's "[went] along with" remark "did not place anything before the jury that it had not already heard." *Id.* And in addressing the prosecutor's closing argument, the Michigan Court of Appeals agreed with Brown that the prosecutor had used Allen's statement to Woods as substantive evidence. *Id.* at *6. But, said the court, "After the attorneys finished their closing arguments, the trial court's final instructions to the jury included the following: ' . . . You may consider an inconsistent statement made before the trial only to help you decide how believable the witness's testimony was when testifying here in court.'" *Id.* "Because this Court presumes that

the jury followed its instructions," the state court concluded, "defendant has not established that the prosecutor's improper remark deprived defendant of a fair trial." *Id.*

Although the Michigan Court of Appeals analyzed the prosecutor's use of Allen's statement to Woods as separate claims of error, the state appellate court still addressed the merits of Brown's claims about the prosecution's use of the statement. So § 2254(d) applies. And, in this Court's view, the Michigan Court of Appeals' decision did not involve an unreasonable application of U.S. Supreme Court precedent or an unreasonable determination of the facts.

Once Allen testified that he could not recall if shots were fired when the gun was wrestled away from Brown, it was arguably not misconduct for the prosecutor to introduce, through Woods, Allen's prior inconsistent statement that the gun went off as it was being wrestled away. As the Michigan Court of Appeals stated, Allen offered an account of many events on the night of the shooting such that his credibility was generally at issue. And even if there was no real reason to impeach Allen (after all, he testified that he saw Brown fire a shot toward the two fighters *before* he saw someone trying to wrestle the gun away (PageID.711–716)), the Court fails to see how the prosecutor's use of Allen's statement to Woods deprived Brown of a fundamentally fair trial. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (asking "whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process").

15

As for the prosecutor's remark that Brown's medical records "[went] along with" Allen's statement to Woods, the Michigan Court of Appeals reasonably found that the statement was not prejudicial. As the state court reasoned, the jury had already heard (1) Allen testify that he could not recall whether shots were fired when the gun was wrestled away and (2) Woods testify that Allen told him that the gun went off during the struggle.

That leaves the prosecutor's closing argument. When the prosecutor referenced Allen's statement to Woods, Brown's counsel made a contemporaneous objection prompting the trial court to say, "It can't be used as substantive evidence." (PageID.1652.) And then, as the Michigan Court of Appeals pointed out, the trial court later gave an instruction that a prior statement was for gauging credibility (unless it was made under oath). (PageID.1771.) Given the combination of the contemporaneous objection during the prosecution's closing and the subsequent jury instruction on prior statements, the Michigan Court of Appeals reasonably found that "[Brown] ha[d] not established that the prosecutor's improper remark deprived defendant of a fair trial," *Brown*, 2019 WL 7206131, at *6.

What about the prosecutor's use of Larnel's prior statement? The Michigan Court of Appeals explained, "Although the 'snippet' that was played before the jury was not transcribed, the prosecutor's follow-up question only related to the circumstances in which [Larnel's] statement was made, which suggests that the content of the statement was not yet apparent." *Brown*, 2019 WL 7206131, at *6. The Michigan Court of Appeals continued, "The prosecutor then moved to admit the full

recording, again suggesting that the substance of Larnel's recorded statement had not been published to the jury yet." *Id.* "Thus," the court concluded, "it does not appear that the statement was in fact introduced at trial." *Id.*

That "on the merits" determination triggers § 2254(d), and the question here is whether the Michigan Court of Appeals' factual determination—that Larnel's prior statement was not introduced at trial—was reasonable. It was. This Court has reviewed the relevant portion of the trial transcript. (PageID.1044–1048.) Given that the transcript does not reflect all that transpired, the Michigan Court of Appeals' interpretation of what transpired was reasonable. After the audio was played, the prosecutor asked, "Do you recognize whose voice that is, sir?" and other questions that were not related to the substance of the audio. (PageID.1047.) Moreover, the trial court suggested that Larnel's recorded statement was *consistent* with his in-court testimony. (*See* PageID.1048; PageID.1044 (Larnel's testimony that after he was shot, he saw Brown with a gun).)

In short, § 2254(d) precludes granting Brown a writ based on his claim that the prosecution repeatedly used impeachment material as substantive evidence of guilt.

### 4.

Next, Brown claims that the prosecutor engaged in misconduct by making a civic duty argument during closing arguments. (ECF No. 1-1, PageID.45.)

During closing, the prosecutor argued, "And I suggest to you, ladies and gentlemen, that is every citizens' worst nightmare, that you're out minding your own

business in a crowd and somebody pulls out a gun and starts shooting. By the Grace of God not more people were hit and—." (PageID.1650.) At that point, Brown's counsel interrupted, "I object to an argument being made that the prosecutor is making now about the general public and about the citizens. I believe it's out of line." (*Id.*) The prosecutor responded, "I would suggest that's not an improper argument based on the defendant's actions." (*Id.*) The court then stated, "Please proceed." (*Id.*)

The Michigan Court of Appeals addressed Brown's claim that the prosecutor made an improper argument. The state court acknowledged that, in general, a prosecutor may not "appeal[] to the jurors' sympathies and sense of civic duty." *Brown*, 2019 WL 7206131, at *8. But, the Michigan Court of Appeals explained, "prosecutors are given wide latitude in arguing the facts and reasonable inferences, and need not confine argument to the blandest possible terms." *Id.* (internal quotation marks omitted). In the state court's view, "the prosecutor's argument was premised on record evidence, it was not improper, and defendant has not established that the prosecutor's argument deprived him of a fair trial." *Id.*

That is an "on the merits" determination meaning that Brown must clear § 2254(d). He has not. Brown cites no Supreme Court case finding a due process violation on like facts. Nor was the Michigan Court of Appeals' interpretation of the prosecutor's remarks an unreasonable factual determination. As that court stated, "[the] prosecutor's description of the shooting may have painted a vivid picture of the incident as 'every citizens' worst nightmare,'" but it was still grounded in evidence that Brown fired a shot toward Larnel and Jenkins' fight when there was a crowd

around, which put civilians in harm's way. Accordingly, § 2254(d) bars this claim for the writ.

5.

As yet another claim of prosecutorial misconduct, Brown complains of the prosecution's repeated interruption of his closing argument.

During closing argument, Brown's attorney mentioned that Jenkins, Brown's friend, had been subpoenaed to an interview where defense counsel was not present; the prosecutor interrupted, "I'm going to have to ask the Court to instruct on the legality of investigator subpoenas now." (PageID.1732.) The court indicated that the issue would be addressed after closing arguments and admonished defense counsel to "restrict [his] closing arguments to the evidence." (PageID.1732.) A few minutes later, Brown's counsel argued to the jury that the prosecutor had constantly led witnesses by asking "is it fair to say" and then suggesting an answer. (PageID.1737.) The prosecution objected that Brown's counsel was not "talk[ing] about the evidence." (*Id.*) The court overruled the objection but told Brown's attorney that he was walking "a fine line." (PageID.1738.) Toward the end of his closing, Brown's counsel discussed deliberations: "it's nice to get along and I'm not saying you shouldn't, be civil . . . . [T]here may[—]and it'll be an instruction. There may come a time when 11 of you—" (PageID.1750.) At that point, the prosecutor objected. (PageID.1750.) Following a sidebar, Brown's counsel attempted to tell the jury about an instruction relating to one juror reaching a determination different from the others; the court interrupted Brown's counsel, noting that he should not comment on "what may or may not

19

happen." (PageID.1751.) Aside from these three interruptions, there were some other points during Brown's closing where the prosecutor objected.

In Brown's view, these repeated interruptions of his closing argument amounted to prosecutorial misconduct.

The Michigan Court of Appeals addressed and rejected this claim. It stated in part, "By focusing much of his closing argument on procedural requirements and compliance that were matters for the trial court to decide, defense counsel drew the jury's attention away from its fact-finding role." *Brown*, 2019 WL 7206131, at *7. "Because a litigant must raise objections at a time when the trial court has an opportunity to correct the error," said the Michigan Court of Appeals, "it was not improper for the prosecutor to interrupt defense counsel's closing to raise good-faith objections to what the prosecutor perceived as inappropriate arguments. Defendant had not established prosecutorial error in this regard." *Id.*

That "on the merits" determination triggers § 2254(d) deference. And Brown has not directed the Court's attention to any U.S. Supreme Court decision finding that a prosecutor's objections during a defendant's closing argument rises to the level of violating the Constitution. And while perhaps the prosecution could have objected less during Brown's closing argument, the Court cannot say that the interruptions prejudiced Brown's case in any significant manner. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." (internal quotation marks omitted)). And even if that conclusion is subject

20

to fair debate, that would still mean the Michigan Court of Appeals' decision was reasonable, which, in turn, would mean that § 2254(d) bars relief.

## B.

Apart from prosecutorial misconduct claims, Brown claims that his trial counsel was constitutionally ineffective. According to Brown, the prosecution produced 23 recordings of his jailhouse calls just days before trial. (ECF No. 1-1, PageID.28.) The recordings were, collectively, over 10 hours long, and the prosecution provided no transcript of the calls. (ECF No. 1-1, PageID.28.) Brown says his trial counsel listened to nine (or so) of the calls, but finding nothing relevant in those, did not listen to the remainder. (*See* ECF No. 1-1, PageID.28, 56–57.) As it turned out, Brown's counsel did not listen to the call where Brown told his friend that he was caught in Larnel and Jenkins' "crossfire." (ECF No. 1-1, PageID.28.) And as discussed above, the prosecution played part of that call at trial to suggest that Brown's account about being choked by an attacker was false. Because Brown's attorney did not listen to the "crossfire" recording, Brown believes his counsel was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). (ECF No. 1-1, PageID.54.) Under *Strickland*, the "proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688.

The Michigan Court of Appeals addressed this claim. It stated in part, "[Brown's counsel] listened to 9 or 10 recordings before returning to other trial preparations. Counsel purportedly made this decision because, in the recordings he reviewed, [Brown] refused to discuss 'the specifics of the incident' over the phone.

21

[Brown] also contends that the prosecutor told [his] counsel that she did not intend to introduce the recordings at trial." *Brown*, 2019 WL 7206131, at *11. "Under these circumstances," said the Michigan Court of Appeals, "defense counsel's decision to focus on other matters in the days preceding the trial was not objectively unreasonable, as he had every reason to believe that the recordings did not contain anything of evidentiary value to the case." *Id.*

The Michigan Court of Appeals thus adjudicated *Strickland's* performance prong "on the merits." And so instead of deciding whether counsel's performance was deficient under *Strickland*, this Court merely decides whether the Michigan Court of Appeals reasonably found that counsel's performance was not deficient under *Strickland. See King v. Westbrooks*, 847 F.3d 788, 795 (6th Cir. 2017).

The answer is "yes." Brown says that the prosecution produced the recordings shortly before trial and indicated that it was not going to use the recordings at trial. Brown also says that counsel listened to many of the recordings only to find them irrelevant. And listing to all the calls would have used precious trial-preparation time on a small part of the evidence. In these circumstances, it was not constitutionally deficient performance to not listen to all the calls. Or, more precisely, the Michigan Court of Appeals finding to that effect was reasonable. *See* 28 U.S.C. § 2254(d).

Resisting this conclusion, Brown argues that the "[Michigan] Court of Appeals failed to give sufficient weight to [his] request on the record for his attorney to play the entire ['crossfire'] phone call when he told the prosecutor and the jury the played snippets were taken out of context." (ECF No. 1-1, PageID.59–60; *see also* ECF No. 7,

PageID.2693 (citing PageID.1603).) "Here," says Brown, "the deficient performance is in not listening to the client and not playing the tape for the jury." (ECF No. 1-1, PageID.60.)

To the extent that this is meant to be a standalone claim of ineffective assistance, it appears to be unexhausted. (*See* PageID.2038–2043.) And even if Brown is merely making this argument to clear § 2254(d), he has not done so. First, the trial transcript does not reflect that Brown asked his counsel to have the entire call played: "[Audio played.] Q. This is a good friend of yours, sir? A. Yes. Q. And you're telling them you got caught in the crossfire? A. Of their fight. You didn't play the rest of it." (PageID.1603.) Second, as that exchange shows, Brown was able to tell the jury that he was referring to the crossfire of Larnel and Jenkins' "fight" and that the prosecutor had not played the whole call. That took some of the sting out of the impeachment. Third, Brown's counsel had not listened to the whole call and thus did not know whether it may include inculpatory statements; so counsel may have thought that playing the entire call would only make matters worse. In all, Brown's counsel did not perform deficiently in failing to request that the entire call be played to the jury.

As an alternative ineffective-assistance theory based on the same facts, Brown relies on *United States v. Cronic*, 466 U.S. 648 (1984). In particular, he argues that the circumstances created by the prosecutor—producing hours of recorded phone calls just days before trial—made it impossible for even competent counsel to prepare for the prosecution's use of the "crossfire" call. (*See* ECF No. 1-1, PageID.54, 58.) If *Cronic*

23

applies, Brown would be entitled to a presumption that his trial counsel was ineffective.

The Michigan Court of Appeals also addressed this alternative ineffective-assistance theory: "Considering [counsel's] involvement from the onset of defendant's case, there can be no suggestion that defense counsel lacked familiarity with the evidence against defendant, even if his review of the recorded phone calls was limited." *Brown*, 2019 WL 7206131, at *12. "To the contrary," explained the state appellate court, "it is clear from defense counsel's cross-examinations and objections that he was well prepared for trial and vigorously advocated on defendant's behalf." *Id.* Thus, in the Michigan Court of Appeals' view, "[Brown's] alternative argument under *Cronic* is unpersuasive. This is simply not a case in which defendant can or has claimed a *complete deprivation* of the effective assistance of counsel." *Id.* (emphasis added). Instead, said the court, "defendant asserts a discrete, isolated instance of deficient performance that is properly reviewed under the two-part *Strickland* test." *Id.*

Although that was an "on the merits" determination, Brown thinks that the Michigan Court of Appeals unreasonably applied *Cronic* such that he has cleared § 2254(d)'s bar to habeas corpus relief. According to Brown, the Supreme Court in *Cronic* identified a few situations where the Sixth Amendment right-to-counsel would be violated, only one of which was the complete deprivation of counsel. (*See* ECF No. 1-1, PageID.59.) Brown argues that *Cronic* recognized a Sixth Amendment violation

24

where "counsel is called upon to render assistance under circumstances where competent counsel very likely could not." (ECF No. 1-1, PageID.55, 59.)

The Michigan Court of Appeals' decision was not "contrary to" and did not involve an "unreasonable application" of *Cronic*'s holding. *See* 28 U.S.C. § 2554(d). True, as Brown suggests, the Supreme Court did recognize that in circumstances where it would be unlikely for any lawyer to provide effective assistance, "a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *See Cronic*, 466 U.S. at 659; *see also id.* at 661 (describing a circumstance where "ineffectiveness was properly presumed without inquiry into actual performance at trial"). But the Michigan Court of Appeals acknowledged this scenario: "In [*Cronic*], the United States Supreme Court identified three . . . circumstances [where prejudice is presumed] . . . third, where a fully competent lawyer would be unable to provide effective assistance under the [surrounding] circumstances." *Brown*, 2019 WL 7206131, at *11. And the Michigan Court of Appeals recognized that Brown was attempting to invoke this third scenario: "[Brown] seems to suggest that defense counsel's performance falls within the third scenario described in *Cronic* because no reasonable attorney would have been prepared to rebut the prosecutor's use of the recording under the circumstances in which it was produced." *Id.* All of that was reasonable.

Moreover, the Supreme Court in *Cronic* provided just one example of circumstances where even competent counsel was unlikely to provide effective assistance—the facts of *Powell v. Alabama*, 287 U.S. 45 (1932)—and the Michigan

Court of Appeals reasonably distinguished Brown's situation from the one in *Powell*. *Powell* was a high-profile case where no attorney appeared for defendants before trial; on the first day of trial an attorney appeared and told the court "that he had not had an opportunity to prepare the case or to familiarize himself with local procedure, and therefore was unwilling to represent the defendants on such short notice." *Cronic*, 466 U.S. at 660 (discussing *Powell*). Even so, the case proceeded to trial, and the defendants were convicted and sentenced to death. Here, the prosecutor's late production of Brown's jailhouse calls, even with the accompanying indication that she would not use them at trial, simply did not place Brown's attorney in a situation comparable to the situation facing the attorney in *Powell*. Thus, the Michigan Court of Appeals reasonably found that Brown's case is "clearly distinguishable" from *Powell*. 2019 WL 7206131, at *12 ("[I]t is clear from defense counsel's cross-examinations and objections that he was well prepared for trial and vigorously advocated on defendant's behalf.").

In short, although the Michigan Court of Appeals stated that *Cronic* did not apply because there was not a "complete deprivation" of the effective assistance of counsel, it also found that Brown's situation did not fall within the third scenario described in *Cronic* because the "surrounding circumstances" underlying Brown's situation were not similar to those in *Powell*. As *Powell* was the only example of the third scenario provided by the Supreme Court in *Cronic*, the Michigan Court of Appeal's decision was not contrary to and did not involve an unreasonable application of *Cronic*'s holding. *See* 28 U.S.C. § 2254(d).

26

**IV.**

For the reasons given, the Court DENIES Brown's petition for a writ of habeas corpus. (ECF No. 1.) By separate order, the Court will deny Brown a certificate of appealability.

SO ORDERED.

Dated: September 29, 2022

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE